Reynold LEONE, as Administrator of the Estate of Andrea Leone, also known as Andrea Held, deceased, Plaintiff,

v.

UNITED STATES, Defendant.

Frances S. COSTIGAN (now known as Costigan–Leeds), as Executrix of the Estate of George B. Costigan, Jr., deceased, Plaintiff,

v.

UNITED STATES, Defendant.

Nos. CV 87–1568 (RJD), CV 87–1609 (RJD).

United States District Court, E.D. New York.

June 8, 1988.

Milton Sincoff, Margaret Sowah, Kriendler & Kriendler, New York City, for plaintiffs.

Thomas B. Almy, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

MEMORANDUM AND ORDER

DEARIE, District Judge.

This is a Federal Tort Claims Act ("FTCA") suit by the estates of two persons who died in an airplane crash when the pilot suffered a heart attack and the plane crashed, killing all aboard. Plaintiffs claim that the doctors who performed medical exams of the pilot, which are conditions precedent to obtaining a pilot's certificate, were government employees who conducted the exams negligently.

The United States has moved to dismiss on two grounds. Plaintiffs have cross-moved for partial summary judgment. For

the reasons stated below, the government's motion is denied in its entirety and the plaintiffs' cross-motion for summary judgment is granted.

FACTS

On November 16, 1984, a single engine Piper aircraft crashed, killing plaintiffs' decedents, who were passengers in the aircraft. The aircraft crashed when the pilot, Irwin R. Small, apparently suffered a heart attack and lost control of the aircraft. At the time of the crash Mr. Small had the required Federal Aviation Administration ("FAA") third-class medical certificate enabling him to operate his aircraft.[1]

The Code of Federal Regulations sets out various physical requirements for those seeking to obtain medical certification as a pilot. The regulations for a third class medical certificate, 14 C.F.R. § 67.17 (1987), provide that an applicant must have no established medical history or clinical diagnosis of (1) myocardial infarction; (2) angina pectoris; or (3) coronary heart disease that has required treatment or, if untreated, that has been symptomatic or clinically significant. Those charged with the responsibility of issuing or denying medical certificates based upon whether or not applicants meet these medical standards are referred to as aviation medical examiners ("AMEs"). *See Federal Aviation Administration's Guide to Aviation Medical Examiners* (1981).

Two AMEs conducted physical exams of Mr. Small. In September, 1982, Dr. John Sabatine examined Mr. Small for the issuance of his third-class medical certificate. In August, 1984, Dr. John Conlon examined Dr. Small for the purpose of renewing that certificate.[2]

Plaintiffs claim in their complaints that the physicians were negligent in their examinations in (1) failing to question or inadequately questioning Mr. Small about his medical history; (2) failing to or inadequately performing a stethoscopic examination of Mr. Small's heart; (3) failing to or

inadequately examining Mr. Small's skin by failing to see a catheterization scar or obtain information about it; and (4) failing to find the medical history or clinically significant signs of angina or coronary heart disease. Plaintiffs further allege that the negligence of the AMEs proximately caused the deaths of their decedents, thus subjecting the United States to liability under the FTCA.

DISCUSSION

The FTCA, 28 U.S.C. § 1346(b), authorizes suits against the United States for damages

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or the omission occurred.

The FTCA further provides that the United States shall be liable with respect to tort claims "in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674.

The FTCA did not waive the sovereign immunity of the United States in all respects; rather, Congress carved out various exceptions to the FTCA's broad waiver of immunity. One of those exceptions provides that the FTCA shall not apply to

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, *or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.*

---

1. There are three classes of medical certificates. A third-class certificate requires the least comprehensive check and is required for private flying. 14 C.F.R. § 67.17.

2. Plaintiffs assert in their complaints that Drs. Sabatine and Conlon are employees of the Federal Aviation Administration. The United States denies this assertion.

28 U.S.C. § 2680(a) (emphasis added). The legislative history of the discretionary function exception indicates that it was

> designed to preclude application of the act to a claim based upon an alleged abuse of discretionary authority by a regulatory or licensing agency ... It is neither desired nor intended that the legality of regulations, or the propriety of a discretionary administrative act should be tested through a damage suit for tort. The same holds true of other administrative action not of a regulatory nature, such as the expenditure of Federal funds, the execution of a Federal project, and the like.

Hearings on H.R. 5373 and H.R. 6463 before the House Committee on the Judiciary, 77th Cong.2d Sess. 28, 33 (1942) (quoted in *Pelham v. U.S.*, 661 F.Supp. 1063, 1070 (D.N.J.1987)). This discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa De Viacao Aerea Rio Grandense*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984) (hereinafter *Varig Airlines*).

Seizing on the language of §§ 2674 and 2680(a), the government makes two arguments for dismissal. First, the government argues that because there is no comparable authority in the private sector for the certification of pilots, the United States cannot be held liable for negligence in the regulation of its pilots through its medical certification process. Second, the government argues that the certification of pilots in question here fits squarely with the discretionary function exception. Plaintiffs urge the Court to reject the government's arguments and to grant them summary judgment striking the government's affirmative defense of discretionary function. The Court will address the government's arguments in reverse order.

### 1. *Discretionary Function Exception*

The Supreme Court examined the nature and scope of the discretionary function ex-

ception in *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). *Dalehite* involved claims for damages against the government arising out of an explosion of ammonium nitrate fertilizer, which had been produced and distributed under the direction of the government for export to areas occupied by the allied forces after the Second World War. The plaintiffs alleged that several acts of the government constituted negligence: the cabinet-level decision to institute the fertilizer export program; the failure to experiment with the fertilizer to determine the possibility of explosion; the drafting of the plan of manufacture; and the failure properly to police the storage and loading of the fertilizer.

The Supreme Court concluded that the allegedly negligent acts were governmental duties protected by the discretionary function exception. Describing the discretion protected as "the discretion of the executive or the administrator to act according to one's judgment of the best course," 346 U.S. at 34, 73 S.Ct. at 967, the Court stated:

> It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.

*Id.* at 35–36, 73 S.Ct. at 968.

Several years after *Dalehite*, the Second Circuit, in *Hendry v. United States*, 418 F.2d 774 (2d Cir.1969), had occasion to consider that case in the context similar to that in the case at bar. In *Hendry*, plaintiff was licensed by the Coast Guard as qualified to sail as master of a steam vessel. Following certain bizarre behavior by the plaintiff, the Coast Guard conducted an

investigation and requested that plaintiff give up his license until he was declared fit by the U.S. Public Health Service. Plaintiff assented to this. *Id.* at 777.

A psychiatrist at the Public Health Hospital conducted an initial examination of the plaintiff and, although evincing some doubts, declared the plaintiff "fit." On the day after the exam, however, that psychiatrist received a copy of the Coast Guard report on the plaintiff and copies of letters the plaintiff had written. After seeing these items, the psychiatrist ordered a psychological exam, which was later conducted by a second doctor and which concluded that plaintiff was psychologically unfit. Upon receiving the results of the second exam, the first doctor concluded plaintiff was unfit for sea duty. Plaintiff objected to that conclusion and underwent a psychiatric exam through a private doctor, which resulted in a finding of fitness. Thereafter plaintiff sought reexamination by the Coast Guard, which was later had and resulted in a finding favorable to plaintiff. *Id.* at 778.

Plaintiff then brought suit, alleging negligence and malpractice on the part of the agents of the United States, to wit, the first two doctors. After a bench trial, Judge Pollack dismissed the suit for lack of jurisdiction and, alternatively, on the merits. Judge Pollack based his jurisdictional holding on the discretionary function exception. On appeal, however, the Second Circuit reversed.

Judge Waterman, writing for a panel that included Judges Friendly and Kaufman, pointed out that "[t]he medical examination by the Public Health Service had no purpose other than to enable the Coast Guard to make a determination on licensing." 418 F.2d at 780. The Court also pointed out that "the determination of whether the appellant should be licensed as fit for sea duty depended entirely on the outcome of the medical examination." *Id.* Consequently, the controlling question was "whether this hybrid medical-administrative decision involved the kind of discretion which § 2680(a) seeks to protect." *Id.*

The Court then surveyed the case law dealing with licensing determinations and malpractice cases and noted

No very clear rule emerges from either the licensing or the malpractice cases. It seems clear that where the grant of a license depends upon the balancing of several factors and the grant or refusal to grant is made without reliance upon any readily ascertainable rule or standard, the courts will hold the judgment to be discretionary. On the other hand, the Pennsylvania Railroad case, supra, seems correctly to indicate that where the grant involves nothing more than the matching of facts against a clear rule or standard, the grant will be considered operational and not discretionary. Thus a hypothetical statute requiring that an employment certificate issue to all applicants of more than a given age, height, and weight would not empower an official to make a discretionary judgment under Section 2680(a).

*Id.* at 782.

Next, the Court considered this synthesis in light of the Supreme Court opinion in *Dalehite*. The Court reasoned that *Dalehite*

appears to privilege from suit those decisions which either establish a rule for future governmental behavior or constitute an ad hoc determination which neither applies an existing rule nor establishes one for future cases. By contrast *Dalehite* seems to subject to suit those decisions which apply an existing rule to the facts of a case. To be sure, the application of existing rules in new contexts sometimes involves policy decisions by administrative officials akin to those made by legislators. Nevertheless, it can usually be determined whether the governing statute or regulation contemplates that an official will make new rules or *ad hoc* decisions on the one hand or apply old understood rules on the other. Whether the person whose judgment is attacked occupies a high or low level governmental position may be relevant in reaching a conclusion. Too, depending on whether it emphasizes the discretion of the decision-making officer or agency

as did the regulation attacked in *Dupree v. United States* [247 F.2d 819 (3 Cir. 1957)], supra, the language of the statute or regulation may guide the determination.

*Id.* at 783.

> The Court then went on to conclude that Here it seems clear that Hendry complains of the way in which the Coast Guard and the Public Health Service applied medical principles to his case, not of the content of the principles which they adopted as relevant. Nor did the doctors who conducted the examination of Hendry have policy-making rank in their organizations. Finally, the statute and regulations governing the delicensing procedure do not appear to convey discretion to identify and consider public safety goals. The only discretion apparently contemplated is that inherent in the judgments of any medical doctor in private practice.

*Id.* In *Caban v. United States*, 671 F.2d 1230 (2d Cir.1982), the Second Circuit reaffirmed its reasoning in *Hendry* and held that the discretionary function exception did not apply to acts of Immigration and Naturalization Service Agents who improperly detained the plaintiff when he arrived at Kennedy Airport due to his alleged failure to produce proof of American citizenship. The Court observed that the key inquiry in deciding the applicability of the discretionary function exception is whether the challenged action involves the balancing of policy factors. *Id.* at 1232. By limiting the exception's applicability to these policy questions, the *Caban* panel noted, courts would then be protected from questions "involving not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency." *Id.* at 1233 (citing *Blessing v. United States*, 447 F.Supp. 1160, 1170 (E.D.Pa.1978)). Analogizing the facts to those in *Hendry*, the *Caban* panel then reasoned that

> We think that determining whether a merchant mariner is mentally fit involves no less discretion than determining whether an applicant is an American citizen, an objectively verifiable fact. If the former judgment does not involve the kind of discretion protected by the FTCA, then neither does the latter.

671 F.2d at 1233.

It appears clear that *Hendry* and *Caban*, without more, would compel a finding that the discretionary function exception is not applicable here. Those cases, however, must be re-evaluated in light of the Supreme Court's most recent explication of the discretionary function exception in *Varig Airlines*. That case involved two consolidated actions against the Federal Aviation Administration arising from the FAA's aircraft certification process. In the first of the cases, an aircraft was flying from Brazil to France when a fire broke out in one of the lavatories, creating smoke that eventually killed most of the passengers on board. The plaintiffs in that case, which included the airline, alleged that the FAA was negligent in issuing a certificate approving the design of that airplane because the trash receptacle in the lavatory did not satisfy the FAA's safety regulations. *Varig Airlines*, 467 U.S. at 801, 104 S.Ct. at 2758. In the second case, the FAA had issued a certificate that approved the installation of a heater in the cabin of an airplane. The airplane in question suffered an in-flight fire, and crashed, killing the pilot, co-pilot, and two passengers. The plaintiff alleged that the FAA had been negligent in permitting the supplemental certificate necessary for the installation of the heater, since the design of the heater did not comply with applicable FAA regulations. *Id.* at 803, 104 S.Ct. at 2759. The Ninth Circuit Court of Appeals in both cases concluded that the United States was liable to suit under the Federal Tort Claims Act, notwithstanding the assertion of the discretionary function exception.

The certification procedures involved in *Varig Airlines*—"type certification" and "supplemental certification"—were established by the Secretary of Transportation pursuant to authority vested in him by Congress. Both of those procedures essentially involve a delegation to the manufacturer of the ultimate responsibility for assuring compliance with the FAA's design

standards and a spot-check procedure by the FAA to police the compliance. *Id.* at 817–19, 104 S.Ct. at 2766–67.

Framing the plaintiffs' claims as challenges to, first, the implementation of the spot check system of compliance review and, second, the application of that spot-check system to the particular aircraft involved, the Supreme Court concluded that the discretionary function exception barred both of the plaintiffs' claims. *Id.* at 819, 104 S.Ct. at 2767. As to the first claim, the Court reasoned that the implementation of a mechanism for compliance review by an agency is plainly discretionary because

> [j]udicial intervention in such decision making through private tort suits would require the courts to "second-guess" the political, social, and economic judgments of an agency exercising its regulatory function. It was precisely this sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent.

*Id.* at 820, 104 S.Ct. at 2768. As to the second claim, the Court pointed out that the FAA employees who conducted the compliance reviews were empowered to make policy judgments regarding the inspections. Specifically, the FAA engineers and inspectors took calculated risks in administering the spot-check system by checking some items and not checking others. Because of the policy decisions involved in these inspections, the Court concluded that the acts of the FAA employees in carrying out the spot-check system were also protected by the discretionary function exception. *Id.*

Also significant in *Varig–Airlines* is the Supreme Court's articulation of several factors that the Court deemed "useful" in determining whether the discretionary function exception applies in a given case. First, the Court made clear that "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Id.* at 813, 104 S.Ct. at 2764. Second, the Court stressed that "whatever else the discretionary function exception may include, it plainly was intended to en-compass the discretionary acts of the government acting in its role as a regulator of the conduct of private individuals." *Id.* at 813–14, 104 S.Ct. at 2764.

The government contends that *Varig Airlines* warrants dismissal of this suit because there the Supreme Court made clear that the discretionary function exception provides protection against suits challenging regulatory activities. More specifically, the government contends that the *Varig Airlines* ruling means that the entire FAA aircraft certification process is immune from potential tort liability. The government cites to *Proctor v. United States*, 622 F.Supp. 10 (C.D.Cal.1984), *aff'd*, 781 F.2d 752 (9th Cir.), *cert. denied*, 476 U.S. 1183, 106 S.Ct. 2918, 91 L.Ed.2d 546 (1986), where the Court held that the discretionary function exception applied where FAA employees, during the course of their spot-check compliance review, actually endeavored to inspect an aircraft and allegedly did so negligently. The government also cites to a series of post-*Varig Airlines* decisions that have applied the discretionary function exception in the context of FAA certification procedures, *see, e.g., Heller v. United States*, 803 F.2d 1558 (11th Cir.1986) (discretionary function exception applicable where doctors did not consult certain records in denying medical certificate); *Waymire v. United States*, 629 F.Supp. 1396 (D.Kan.1986) (discretionary function exception applicable for an allegedly improper grant of airworthiness certificate); *Wendler v. United States*, 606 F.Supp. 148 (D.Kan.) (discretionary function exception applicable for alleged negligence in context of medical certificate), *aff'd*, 782 F.2d 853 (10th Cir.1985), and urges that their analyses should be applied here.

■ This Court does not believe that *Varig Airlines* should be read so expansively. Although the Supreme Court used rather sweeping language in articulating the key factors in determining the applicability of the discretionary function exception, *ante* at 1187, the precise holding in *Varig Airlines* is that the implementation and application of a spot-check system of

compliance review are protected by the discretionary function exception because they involved policy decisions. Thus, the Supreme Court did not hold that *all* regulatory activities are discretionary. Instead, the Court held that the regulatory activities in that case were discretionary only because they involved policy judgments. Accordingly, the law remains that regulatory decisions—like those in *Hendry* and *Caban*—that do not involve policy judgments are not protected by the discretionary function exception.

This reading of *Varig Airlines* has been adopted by the Second Circuit. In *Eklof Marine v. United States*, 762 F.2d 200 (2d Cir.1985), the Court held that the decision to place a maritime navigational aid at a particular location or to employ only one such aid at that location, as opposed to the initial decision to mark the obstruction, "is not an expression of any 'policy', and thus not protected by the discretionary function exception." *Id.* at 205.[3] Thus, in the Second Circuit the dispositive factor in determining the applicability of the discretionary function exception in the context of regulatory decision making is—as it was before *Varig Airlines*—the presence of policy-weighing components in the challenged activity.

■ What is involved here is an alleged failure to apply clearly articulated medical standards in the context of a physical examination. During that examination, the AMEs, like the doctors in *Hendry*, the INS agents in *Caban*, and the Coast Guard in *Eklof*, made no "policy" decisions. Accordingly, the discretionary function exception is inapplicable.[4]

2. *Comparable Cause of Action Under New York Law*

As discussed above, the FTCA subjects the United States to liability only in those circumstances "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Accordingly, liability will attach here only if the government would be liable in like circumstances under New York law, as the allegedly negligent acts of the doctors took place in New York. *See, e.g., Myers & Myers, Inc. v. United States Postal Service*, 527 F.2d 1252, 1260 (2d Cir.1975); *Blessing v. United States, supra*, 447 F.Supp. at 1186.

The government makes two arguments for dismissal on this branch of its motion. First, the government contends that the United States is the only entity licensing pilots and thus no private citizen could ever be liable for alleged negligent licensing. In essence, the government argues that the United States cannot be held liable for the alleged negligence in carrying out certain government functions that have no private analog. The government places heavily reliance on two decisions, *C.P. Chemical Co., Inc. v. United States*, 810 F.2d 34 (2d Cir. 1987), and *Wendler v. United States*, 606 F.Supp. 148 (D.Kan.), *aff'd*, 782 F.2d 853 (10th Cir.1985).

The government's first argument on this point is unconvincing. *C.P. Chemical* dealt with allegations of a federal agency's "failure to select the appropriate rulemaking procedure in promulgating an administrative regulation." 810 F.2d at 37. The plaintiffs there claimed that the Consumer Product Safety Commission's (the "Commission") decision to ban the use of one of its products in residences and schools was improper because the ban was sought pursuant to the Consumer Product Safety Act, 15 U.S.C. §§ 2058, 2079(d), rather than the Federal Hazardous Substances Act, 15 U.S. C. §§ 1261–1276. After noting the general

---

**3.** Contrary to the government's argument, the *Eklof* panel's use of language indicating partial reliance on the planning/operational dichotomy rejected in *Varig Airlines*, 467 U.S. at 813, 104 S.Ct. at 2764 ("it is the nature of the conduct, rather than the status of the actor, that governs") does not rob *Eklof* of its precedential force, as it is clear that the panel found that no policy decision was involved.

**4.** To the extent that this Court's holding that the discretionary function exception is inapplicable conflicts with the holdings in *Proctor, Heller, Waymire,* and *Wendler, supra*, this Court respectfully disagrees with the analyses those courts employed.

rule that "[q]uasi-legislative or quasi-adjudicative action by an agency of the federal government is action of the type that private persons could not engage in and hence could not be liable for under local law," *id.* at 38 (quoting *Jayvee Brand v. United States,* 721 F.2d 385, 390 (D.C.Cir.1983)), the Court concluded that the Commission's conduct was a *quasi-legislative* act without a private counterpart. *Id.* (emphasis added). The Court stated that "[t]here is simply no comparable rulemaking activity in private life...." *Id.*

What is involved in the case at bar, however, is not quasi-legislative activity; rather, it is the alleged negligence of government agents in the mechanical application of pre-existing regulatory criteria. Put simply, what is involved is not rule-making, as in *C.P. Chemical,* but rule-applying, which has been found to have analogs under state law. *See, e.g., Hendry, supra,* 418 F.2d at 779, 784. Thus, the government's reliance on *C.P. Chemical* is misplaced.

The government's reliance on *Wendler* is similarly misplaced. That case involved allegations of negligence in suspending plaintiff's commercial pilot certificate and processing plaintiff's reapplication for that certificate. The Court concluded that "because the medical licensing authority of FAA is unparalleled in the private sector, this case is clearly one where the government is 'acting in its role as regulator of the conduct of private individuals.' " 606 F.Supp. at 151 (citing *Varig Airlines, supra* ).

The simple response to the government's citation to *Wendler* is that the Second Circuit has not required exactly the same private sector activity as a predicate for finding liability. *See, e.g., Hendry, supra; Ingham v. Eastern Airlines,* 373 F.2d 227 (2d Cir.1967) (finding failure of air traffic controllers properly to report change in weather conditions as sufficient basis for liability). Indeed, the argument that the government advances is strikingly similar to that rejected by the Supreme Court in *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

There the Court addressed claims for damages to a vessel due to Coast Guard negligence in failing properly to maintain a light in a lighthouse. The government argued that it could not be liable since private persons do not perform these same actions. The Court rejected this argument, holding that the FTCA imposes liability on the United States "in the same manner and to the same extent as a private individual under *like* circumstances," not exactly the same circumstances. *Id.* at 64–65, 76 S.Ct. at 124 (emphasis added). Thus, if the government undertakes to warn the public of danger and thereby induces reliance, it must perform its good Samaritan task in a careful manner or answer in damages. *Id.* Accordingly, since the result reached in *Wendler* is contrary to the law followed in this Circuit, the government's reliance on it is unfounded.

The government argues next that even if the Court were to search New York tort law to find an analogous cause of action, the search would prove fruitless "because under New York law there is no cause of action against a physician by passengers in a vehicle operated by a patient of the physician." That statement of law is correct. In *Purdy v. Public Administrator,* 72 N.Y.2d 1, 530 N.Y.S.2d 513, 526 N.E.2d 4 (1988), the New York Court of Appeals held that a physician and health care facility had no duty to third parties who were injured when a resident of the facility caused an accident immediately following an examination by the physician and an authorization by him to leave the facility unaccompanied.

*Purdy,* however, is inapposite to the case at bar. That is made clear from the reasoning of *Purdy,* which is premised on the absence of a lawful basis to restrain the freedom of a *licensed* driver from operating a motor vehicle. What is involved here, by contrast, is not a duty to control one who is already licensed. Instead, it is the duty clearly assumed by the government to carry out its licensing function in a nonnegligent manner. The question, therefore, is whether this can serve as the basis of liability under New York law.

New York recognizes an "assumption of duty" theory of liability. As the New York Court of Appeals stated in *Nallan v. Helmsley–Spear, Inc.*, 50 N.Y.2d 507, 429 N.Y.S.2d 606, 407 N.E.2d 451 (1980):

> The formula for determining when 'one who assumes a duty to act, even though gratuitously, may thereby become subject to the duty of acting carefully' has been articulated by Chief Judge Cardozo as follows: 'If conduct has gone forward to such a state that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward * * * The query always is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good.'

*Id.* at 522, 429 N.Y.S.2d at 615, 407 N.E.2d at 460 (quoting *Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 167–68, 159 N.E. 896, 898 (1928)). *See also Florence v. Goldberg*, 44 N.Y.2d 189, 404 N.Y.S.2d 583, 375 N.E.2d 763 (1978); *Glanzer v. Shephard*, 233 N.Y. 236, 135 N.E. 275 (1922); *Wroblewski v. Otis Elevator Co.*, 20 A.D. 2d 732, 246 N.Y.S.2d 958 (3d Dep't 1959); *Cline v. Avery Abrasives*, 96 Misc.2d 258, 409 N.Y.S.2d 91 (Sup.Ct. Monroe County 1978).

In *Nallan, supra,* the New York Court of Appeals addressed a claim for damages by a visitor to an office building who was shot by an unknown assailant as he signed the guest register of the building. Plaintiff alleged, *inter alia*, that the owner negligently performed an assumed obligation to provide a lobby attendant for security purposes. In applying New York's assumption of duty principle, the Court observed that in order to establish his claim, plaintiff would have to show not only that the landlord undertook to provide a service and did so negligently, but also that the owner's conduct placed the plaintiff in a more vulnerable position than he would have been in had the owner never acted at all. *Nallan*, 50 N.Y.2d at 522, 429 N.Y.S. 2d at 615, 407 N.E.2d at 460. The Court went on to hold that the plaintiff could recover only if it was reasonably forseeable that members of the public would rely upon the presence of the attendant in the lobby and would tailor their own conduct accordingly. *Id.* at 523, 429 N.Y.S.2d at 616, 407 N.E.2d at 460.[5]

■ Although it is not on all fours with the case at bar, *Nallan* is persuasive authority for a finding of liability here. The United States assumed the duty of licensing pilots. The negligent performance of that task surely placed plaintiffs in a more vulnerable position position than they would have been in had the government not acted at all. This is so because the pilot would not have been licensed and flying if the government had not acted. Plaintiffs also might be able to establish a reliance theory by proving that members of the public relied upon the government certification of pilots and that they tailored their conduct accordingly. *See Nallan, supra,* 50 N.Y.2d at 523, 429 N.Y.S.2d at 616, 407 N.E.2d at 460; *see also Ingham, supra,* 373 F.2d at 236 (proof of assumption of duty and reliance sufficient under "good Samaritan" theory); *Blessing, supra,* 447 F.Supp. at 1160 (proof of increase of risk or reliance sufficient under "good Samaritan"

---

**5.** There seems to be a contradiction in the Court of Appeals' application of the rule and its later formulation of its holding. In the former, the Court stated that the building owner could be held liable if plaintiff showed that the owner placed the plaintiff in a more vulnerable position. *Nallan*, 50 N.Y.2d at 522, 429 N.Y.S.2d at 615, 407 N.E.2d at 460. In the latter, the Court stated that the owner would be liable only if the plaintiff established reliance. *Id.* at 523, 424 N.Y.S.2d at 616, 407 N.E.2d at 460. These are distinct concepts. The distinction is made clear in the Restatement (Second) of Torts §§ 323 and 324A, where proof of an increase of the risk of harm and proof reliance are listed alternatively, and the proof of either one is sufficient to establish liability. *Compare* Restatement (Second) of Torts §§ 323(a) and 324A(a) (1965) *with id.*, §§ 323(b) and 324A(c). This Court assumes *that* proof of *either* an increase of the risk of harm or reliance is sufficient under New York law.

theory). This reliance theory appears particularly appropriate here, as private pilots generally are not subjected to the more frequent and often more exacting private examinations to which commercial pilots are subjected, and thus a passenger in a private aircraft might reasonably place great reliance on the government's physical certification process. In sum, the government's argument that there exists no comparable cause of action under New York law must fail.

## CONCLUSION

The motion for the United States is denied in all respects. Plaintiffs' cross-motion is granted.

SO ORDERED.