Reynold LEONE, as Administrator of the Estate of Andrea Leone, also known as Andrea Held, deceased, Plaintiff,

v.

UNITED STATES, Defendant.

Frances S. COSTIGAN (now known as Costigan–Leeds), as Executrix of the Estate of George B. Costigan, Jr., deceased, Plaintiff,

v.

UNITED STATES, Defendant.

No. CV 87–1568.

United States District Court, E.D. New York.

June 27, 1989.

**1183**

Milton G. Sincoff and Daniel M. Kolko, Kriendler & Kriendler, New York City, for plaintiffs.

Thomas B. Almy, Torts Branch, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

■ This is a Federal Tort Claims Act ("FTCA") suit brought by the estates of two individuals killed when the pilot of an airplane in which they were passengers suffered a heart attack and the plane crashed. Plaintiffs claim that the physicians who performed medical examinations of the pilot as a step in the pilot's licensing by the Federal Aviation Administration ("FAA") were "employees of the government" who conducted the examinations negligently.

The government has moved for summary judgment dismissing the complaint on the ground that for the purposes of the FTCA, the physicians are independent contractors for whose alleged negligence the United States is not liable.

Plaintiffs have cross-moved for partial summary judgment striking the part of the government's fifth affirmative defense which sets forth the theory advanced in the government's present motion.

For the reasons set forth below, the government's motion is denied and plaintiffs' cross-motion is granted.

FACTS [1]

In pursuit of its statutory mandate to promote aircraft safety, *see* 49 U.S.C.App. § 1348(a), the FAA requires that persons seeking to be licensed as pilots first obtain the appropriate medical certification. 14 C.F.R. § 61.3(c). The FAA has promulgated detailed medical standards which applicants seeking certification must meet. 14 C.F.R. §§ 67.13, 67.15, 67.17 (hereinafter the "applicable medical standards"). The determination that an applicant has (or has not) met the FAA's medical requirements is

---

1. The facts are set forth in greater detail in this Court's prior decision in this action, *Leone, et al.* *v. United States,* 690 F.Supp. 1182 (E.D.N.Y. 1988).

based on an examination conducted solely for that purpose and an evaluation of the applicant's medical history and condition. *Id.* at § 67.11.

The FAA has delegated the task of medical examination and evaluation of pilot applicants to physicians designated as Aviation Medical Examiners ("AMEs"). Specifically, the FAA has delegated to AMEs (and to the Federal Air Surgeon) the authority

> to issue or deny medical certificates to the extent necessary to (1) examine applicants for and holders of medical certificates for compliance with applicable medical standards; and (2) issue, renew, or deny medical certificates to applicants and holders based upon compliance or non-compliance with applicable medical standards.

*Id.* at § 67.25.

The vast majority of persons designated as AMEs are physicians in private practice, on hospital staffs, or otherwise not "employed" by the FAA. A few of the physicians the FAA designates as AMEs, however, are persons already employed by the FAA.

In 1981, the FAA issued a revised *Guide for Aviation Medical Examiners* (the "*Guide*") "to assist" AMEs in the performance of their duties. The *Guide* informs AMEs that the applicable medical standards (14 C.F.R. Part 65) are "established by law" and therefore binding on AMEs. The revised *Guide* also states, on its first page, that "the [AME] is a designated *representative of* the FAA Administrator with important duties and responsibilities" (emphasis added).

In 1978 the FAA issued an order (the "FAA Order"), revised in 1981, which states, *inter alia*, that "[i]t is the policy of the [FAA] to continuously evaluate the performance of each AME." FAA Order, section 13(b)(1). AME evaluations assess (i) the "adequacy of information" the AMEs provide on forms following examinations; (ii) the "error rate" in certification; (iii) "reports from the aviation community concerning the AMEs' professional performance and personal conduct as it may reflect on the [FAA];" (iv) attendance at seminars; and (v) performance reports, including a quarterly and annual performance summary and a training summary. *Id.* In addition, the FAA Order requires the AMEs to comply with the *Guide*, to attend training seminars, to obtain and use particular equipment, and to perform personally each pilot examination.

The FAA regulations also provide that when conducting the examinations, AMEs act "[u]nder the *general supervision* of the Federal Air Surgeon or the appropriate senior regional flight surgeon." 14 C.F.R. § 183.21(b) (emphasis added).

In addition to the FAA regulations, FAA Order, and the 1981 *Guide*, the FAA describes the duties and functions of AMEs in yet another publication, FAA Form 8510–2, the Aviation Medical Examiner Designation Application (the "Application"). In the Application, the FAA states that it utilizes AMEs "to carry out responsibilities for enforcement of physical standards prescribed in the [FAA regulations]" and that "the AME acts *officially as a representative* of the FAA...." (emphasis added) The Application requires AME applicants to agree, as conditions of acceptance, to become thoroughly familiar with the *Guide*, to abide by the regulations, and to attend FAA seminars on aviation medicine. Finally, the Application informs AME applicants that all designations are made for one year, and that renewal is contingent upon, *inter alia*, the "accuracy and number of examinations performed."

AMEs receive no remuneration from the FAA but instead are paid a fee by each pilot applicant. The FAA has the authority, however, to set the maximum fee an AME may charge.

## DISCUSSION

### A. *Relevant Provisions of the FTCA.*

The FTCA, 28 U.S.C. § 1346(b), authorizes suits against the United States for damages:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission *of any employee of the Government while acting within the scope of his office or employ-*

*ment,* under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Id.* (emphasis added).

As is well known, there exist several exceptions to the FTCA's broad waiver of the sovereign's immunity.[2] The present motions involve the so-called "independent contractor" exception to the FTCA, embodied in the legislative definitions. Section 2671 of Title 28, U.S.C. provides:

> "Employee of the government" includes officers or *employees of any federal agency,* ... and *persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation* (emphasis added).

Section 2671 further provides that the term "federal agency"

> includes the executive departments, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, *but does not include any contractor with the United States.*

*Id.* (emphasis added).

As the foregoing indicates, there are two theories under which the AMEs could be deemed "employees of the government:" either because they are "employees of any federal agency" (in this case, the FAA), *or* because they are "persons acting on behalf of [the FAA] in an official capacity ..."

## B. *The Arguments of the Parties.*

The government calls for a strict application of the Supreme Court's so-called "strict control" test, as announced in *Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973) and *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976), arguing that the AMEs are independent contractors, and therefore not employees of the government, because the government does not

exercise on-site, day-to-day supervision over them.

Plaintiffs, on the other hand, argue that the AMEs are employees of the government because they "act on behalf of" the FAA. The government essentially ignores this theory, lamely arguing that the "acting on behalf of" clause does not apply in this case. Plaintiffs also argue, however, that the AMEs are employees of the government under a sensible application of the *Logue* and *Orleans* rationale.

As the foregoing indicates, the parties are in disagreement as to which of the two theories of section 2671—the "acting on behalf of" clause, or the contractor exception as construed in *Logue* and *Orleans*—governs the analysis of this case. The Court does not view this case as one that could be resolved simply by deciding that only one of the two available theories governs because, as demonstrated below, (i) the case is not on all fours with *Logue* and *Orleans* and yet it is perhaps too easily decided by the rarely invoked "acting on behalf of" clause; (ii) the Court believes that a common rationale governs regardless of the particular statutory language invoked; and (iii), even if the theories were entirely separable, the Court need not decide which of the two theories governs because under either theory, the AMEs are unquestionably persons for whose negligence the United States may be found liable.

## C. *The "Strict Control" Test of Logue and Orleans.*

### 1. The Cases.

Since both plaintiffs and the government argue under *Logue* and *Orleans,* it is necessary to establish exactly what these two cases hold.

In *Logue,* plaintiffs brought suit under the FTCA alleging that their son's suicide, which occurred while he was a federal prisoner housed in a county jail, was caused by the negligent failure of employees of the

---

**2.** This Court has previously held that the FTCA's "discretionary function" exception does not ap-

ply to AMEs because they perform a "regulatory activity." *Leone, supra,* 690 F.Supp. at 1188.

Nueces County (Texas) jail to maintain adequate surveillance. Section 4002 of Title 18, U.S.C., authorizes the Federal Bureau of Prisons to contract with state prisons for the housing of federal prisoners. The Supreme Court held, however, that the government was not subject to suit because the county jail's employees were not "employees of the government" within the meaning of section 2671.

The Court rejected first the argument that the county jail was a "federal agency or instrumentality" within the meaning of 2671, and that its employees, accordingly, were "employees of the government," since the statutory definition of federal agency expressly excludes "any contractor with the United States." *Id.* The Court concluded that the county jail was not a federal agency because it was an independent contractor. Specifically, the Court found that the "contractor with the United States" language "adopt[s] the traditional distinction between employees of the principal and employees of an independent contractor with the principal." 412 U.S. at 527, 93 S.Ct. at 2219. The Court then announced that "the critical factor in making this determination is the authority to control the *detailed physical performance* of the contractor." *Id.* at 527–528, 93 S.Ct. at 2219 (emphasis added).

The Court noted that although the county provides custody in accordance with the Bureau of Prisons' "rules and regulations governing the care and custody of persons committed," the contract between the Bureau and the county gave the government "no authority to *physically supervise* the conduct of the jail's employees." *Id.* at 529–530, 93 S.Ct. at 2220 (emphasis added). The Court further observed that Congress, when authorizing the government to contract with local jails, "clearly contemplated that the *day-to-day operations* of the contractor's facilities were to be in the hands of the contractor ..." *Id.* (emphasis added). Accordingly, the Court concluded that the county jail was not a "federal agency," and its employees, therefore, not "employ-

ees of the government" under section 2671.[3]

*United States v. Orleans, supra,* is largely a reiteration and application of the principles announced in *Logue.* As in *Logue,* the issue in *Orleans* was whether a particular entity—in that case, a community action agency serving the poor—was a federal agency or an independent contractor within the meaning of section 2671.

A review of the facts of *Orleans* reveals that the relationship between the allegedly negligent individuals and the government in that case resembles the relationship between the jail employees and the government in *Logue.* Under the Economic Opportunity Act, 42 U.S.C. § 2781 *et seq.,* ("EOA") the federal government provides financial support for community action programs administered by state-designated community action agencies. The Warren–Trumbull Council ("WTC"), as such an agency, organized a neighborhood opportunity center which sponsored a recreational outing for a group of children. The WTC arranged the transportation for the outing.

Suit was brought under the FTCA on behalf of a child who was injured when the car transporting him home from the WTC outing was involved in a collision. As expressly stated by the Court, the *sole* issue in *Orleans* was "whether a community action agency funded under the [EOA] is a federal instrumentality or agency for purposes of [FTCA] liability." 425 U.S. at 809, 96 S.Ct. at 1973. The precise holding of *Orleans* decided that the WTC and the neighborhood opportunity center were not federal agencies or instrumentalities for FTCA purposes. Consequently, under a *Logue* analysis, *employees of* the WTC (who ran the neighborhood opportunity center's outing) were not "employees of the government" for whose negligence the United States would be liable. In its reasoning, the *Orleans* Court simply reiterated and applied the *Logue* strict control test, stating that the "critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to

---

**3.** The *Logue* Court also rejected plaintiffs' attempt to rely on the "acting on behalf of" clause.

This portion of the *Logue* opinion is discussed *infra* at section D.

control the detailed physical performance of the contractor.'" 425 U.S. at 814, 96 S.Ct. at 1976 (citing *Logue*).

2. Application to the Instant Action.

As became clear during oral argument, the government would have this Court attribute nearly talismanic weight to the words "day-to-day" and the notion of *on-premises* supervision as applied in the *Logue* and *Orleans* opinions. During argument, counsel for the plaintiffs contended that the FAA does all it practically can to control, monitor and supervise the AMEs' performance, thus satisfying the *Logue* and *Orleans* standard. Plaintiffs suggested specifically that the FAA's promulgation of excruciatingly detailed regulations mandating how AMEs are to conduct exams is sufficient to satisfy *Logue*. Without identifying precisely what, the government insists that more is required. This Court disagrees.

Through its demanding and detailed regulations, the FAA dictates virtually every action the AME should undertake during the examination, specifies the particular information that should be elicited from the pilot applicants, and explicitly sets forth the medical standards the AME must apply in assessing the information and in deciding whether to issue or deny a certificate. The Court wonders what greater degree of control could be exercised over AMEs, unless an FAA official literally sat in the examination rooms, either prompting the AME to ask a question he or she might forget to ask, or holding the stethescope as the AME listened to an applicant's heartbeat. It is noteworthy that at oral argu-

ment the Court asked the government on what set of facts it would deem the "strict control" test met in this case; the government was unable to provide a definitive or even helpful answer, suggesting merely that the test might be met if a badge-wearing FAA official read the applicable medical standards to each AME in person before each examination.

In this Court's view the "strict control" test should be applied not with the absurd literalness suggested by the government, but sensibly, with due regard for the totality of the circumstances, including the nature of the services performed and the configuration of the parties' relationship. It is therefore unnecessary to adopt, as plaintiffs suggest, a modified version of *Logue* and *Orleans* for physicians.[4] *Logue* and *Orleans* were clearly intended to have broad based application beyond the confined factual scenarios suggested by the language employed in those two cases. The decisions prescribe a functional approach, focusing on the activity involved, the need and opportunity for supervision and the amount and source of the supervision or oversight. In *Logue* the Bureau of Prisons deferred entirely to the County jail officials who supervised the day to day operations of the facility without interference of any kind from the federal government. Similarly, in *Orleans*, the community action agency ran its daily operations unencumbered by the scrutiny or supervision of federal authorities. The negligent employees in those cases were supervised not by any federal entity or representative, but by their local employers. The particular language used to articulate the "strict control" test in *Logue* and *Orleans* constitutes a sensible and appropriate test for vicarious federal liability in cases where the relevant players' relationship is structured as it was in

---

4. In addition, the Court notes that contrary to plaintiffs' assertion, no other court has so held. Plaintiffs cite two cases which they believe "establish" the principle that a *modified* "strict control" test should apply to physicians. *See Lurch v. United States*, 719 F.2d 333 (10th Cir.1983); *Quilico v. Kaplan*, 749 F.2d 480 (7th Cir.1984). In each case, however, the passages upon which plaintiffs hang their hats are pure dicta.

Nonetheless, this Court's decision to apply the strict control test sensibly necessarily embraces part of the reasoning of the *Lurch* plaintiff, who argued that those areas of medical services that *are* susceptible to supervision and control should be considered in determining if a physician is a federal employee." *Lurch*, 719 F.2d at 337 (emphasis in original).

*Logue* and *Orleans*. It therefore makes perfect sense that the Supreme Court require, as a condition to holding the federal government liable for the *employees of* an entity with which it contracts, that the government have exercised over that entity's employees at least as much, if not more, control than that entity actually exercises over those same employees.

This is not to suggest that the "other entity" in each of those cases existed, in the eyes of the Court, as a mere alternate deep-pocket for recovery. Rather, the other entity in each of those cases, as the actual employer of the allegedly negligent individuals, functioned as the primary or more proximate employer and supervisor of *its* own employees. Put yet another way, *Logue* and *Orleans* would better support the government's argument here if, for example, the FAA had contracted with the American Medical Association, or with a particular hospital, to designate AMEs to conduct pilot certification exams, and these AMEs were *members of* the Association or *employees of* the hospital and subject to some primary level of supervision or control by the Association or hospital. It is on that factual paradigm that the *Logue* and *Orleans* decisions rest.[5]

In sum, *Logue* and *Orleans* do not prescribe a ritualistic, inflexible formula. The cases instead articulate a sensible, flexible rationale for holding the sovereign vicariously liable which may be applied to a variety of situations. In essence, the cases shield the government from vicarious liability unless the government exercises *comprehensive* and *meaningful control* over the allegedly negligent actor as he performs the *material aspects* of his govern-

ment-commissioned task. This Court cannot envision a more comprehensive or more meaningful scheme for monitoring the AMEs' contribution to the safety of air travel than that presently designed and implemented by the FAA.

**D. *"Persons Acting on Behalf of a Federal Agency in an Official Capacity ... "***

Although Congress defined "employee of the Government" to include "persons acting on behalf of a federal agency in an official capacity ...," the government argues that this Court should disregard this clause in assessing the status of AMEs. While the Court acknowledges that the clause is cited relatively infrequently in FTCA cases, the Court is not persuaded that the clause is necessarily inapplicable to the case at bar. In any event, in light of the previous discussion, extended analysis of the arguments presented on this point is unnecessary.

The government relies on a discussion in *Logue* of the FTCA's legislative history to support its position that Congress intended the "acting on behalf of" clause to apply to only a few special and limited situations. *See Logue,* 412 U.S. at 530–31, 93 S.Ct. at 2220–21. The *Logue* Court acknowledged that

[t]he legislative history to which we are referred by the parties *sheds virtually no light* on the congressional purpose in enacting the "acting on behalf of" language in § 2671.

*Id.* at 531, 93 S.Ct. at 2221 (emphasis added). The Court observed that a single passage in an appendix to the hearings com-

---

5. The government also places reliance on an opinion of the District Court of the Northern District of Texas, *In Re Air crash at Dallas/Fort Worth Airport on August 2, 1985,* Memorandum opinion filed Nov. 5, 1987, M.D.L. No. 657 (the "*Dallas* case"). The issue in that case was whether a negligent weather observer was an employee of the government or an employee of an independent contractor. The facts are structurally analogous to those in *Logue* and in *Orleans:* the National Weather Service ("NWS") contracted with a group called Weather Experts to carry out NWS's duty to operate a weather observatory at Dallas/Fort Worth Airport. Al-

though the NWS provided Weather Experts with instructions for weather observing and reporting, the Court, applying the *Logue* test (whether there is authority in the principal to "control the physical conduct of the contractor in the performance of the contract") concluded that *employees of Weather Experts* were not employees of the government. Mem.Op. at 8.

The players' relationship in the *Dallas* case thus exhibits the same structure as the relationships in *Orleans* and *Logue,* so the decision in the *Dallas* case does not affect this Court's analysis of *Logue* and *Orleans.*

paring the bill as enacted with previous drafts merely

> *affords some support* to the Government's contention that the language is designed to cover special situations such as the "dollar-a-year" man who is in the service of the Government without pay, or an employee of another employer who is placed under direct supervision of a federal agency pursuant to a contract or other arrangement."

*Id.* at 532, 93 S.Ct. at 2221 (emphasis added). Obviously, then, *Logue* does not demand the limited application suggested by the government. With or without *Logue*, however, it is equally clear that the result is the same.

Plaintiffs cite two cases, both holding the United States liable. In *Witt v. United States*, 462 F.2d 1261 (2d Cir.1972), the plaintiff, a military prisoner assigned to the Parolee Unit at the United States Disciplinary Barracks, one day volunteered for a prison work detail at a nearby private club which frequently used prison labor. The club hired one individual, who in turn hired a second, to transport prisoners from the barracks to the club. The plaintiff was injured as a result of the second individual's negligence during the trip from the barracks to the club.

The Second Circuit held that the second hiree was an employee of the government for FTCA purposes because he was "acting on behalf of" the government. The Court believed it "unnecessary" to explore the relationship between the second hiree and the club or between the club and the Army. Instead, the Court reasoned that despite the absence of any written agreement, the second hiree was "impliedly authorized" by the Barracks Commander to transport and help supervise prisoners, and "was certainly *amenable to some degree of control* by the Disciplinary Barracks." 462 F.2d at 1264 (emphasis added).

As to the meaning of the "acting on behalf of" clause itself, the *Witt* Court observed that while the clause "is not without boundaries, ... *quite clearly the statutory language was drafted to have an expansive reach* ... and should be applied with an eye to general agency law rather than to the formalities of employment contracts." 462 F.2d at 1263 (emphasis added) (citations omitted).

In *Close v. United States*, 397 F.2d 686, 687 (D.C.Cir.1968), the Court held that the United States could be liable under the FTCA to a federal prisoner injured while temporarily housed in a District of Columbia jail. Expressly relying on the "acting on behalf of" clause, the Court noted that:

> since the Congress has clearly committed the custody and safekeeping of federal prisoners to the Attorney General, then it must be true that in this instance the D.C. jailer was serving as the Attorney General's jailer; and ... that, as to the federal prisoner, the Attorney General had *some degree of power, commensurate with his continuing responsibility*, to *supervise* the D.C. jailer in his handling of this particular prisoner.

*Id.* at 687.

Applying these principles, without the guiding hand of *Logue*, this Court could easily conclude that the AMEs were employees of the government since (i) the AMEs are "amenable to some degree of control" by the FAA, *see Witt*, 462 F.2d at 1264, and (ii) the FAA, commensurate with its statutory duty to promote air safety, had "some degree of power" to supervise the AMEs in their handling of the medical certification for pilots. *See Close*, 397 F.2d at 687.

The Court is by no means, however, content with such reasoning. A plain, common sense reading of the clause, in light of the facts set forth at the outset of this opinion, supports the conclusion that the AMEs are employees of the government more soundly than reliance on the limited discussion of the clause in *Witt* and *Close*. The government concedes that the AMEs perform a very important task and unquestionably act "for" the FAA; the FAA's own literature describes the AMEs as the agency's "official representatives;" and this Court has already concluded that the FAA exercises about as much control and supervision over the AMEs as practicable. Thus, the Court can see no reason why the government

should not be answerable for an AME's alleged negligence. Such a conclusion is prompted by the Supreme Court's invitation to rest even "acting on behalf of" cases on a finding of *Logue* -type control. That invitation is a brief footnote in *Logue* in which the Supreme Court distinguished, but did not overrule, the holdings of *Witt* and *Close*, noting that those two cases "involved *findings of control* by the Government that are contrary to [the lack of control found by the lower court in the *Logue* case]." *Logue, supra,* 412 U.S. at 533, n. 8, 93 S.Ct. at 2222, n. 8 (emphasis added). Moreover, even if the *Logue* Court had not so addressed (albeit obliquely) the "acting on behalf of clause," it would be illogical to conclude that the clause offers a materially different rationale for federal liability or that it may be used formalistically to circumvent the basic "strict control" requirement.[6]

█ In short, this Court concludes that the sovereign cannot be held vicariously liable absent substantial and meaningful control by the sovereign, regardless of the statutory or other legal term the Court may be asked to construe. To reiterate, then, it is not seriously disputed that the AMEs act on behalf of the FAA when conducting pilot certification examinations, and this Court has already decided, *see* section C, *supra,* that the FAA exercises significant, comprehensive control over the AMEs. Accordingly, the AMEs are employees of the government under the FTCA for whose alleged negligence the United States is answerable.

## CONCLUSION

For the reasons set forth above, the government's motion is denied and the plaintiffs' cross-motion is granted. The portion of the government's fifth affirmative defense, asserting the independent contractor exception, shall be stricken.

SO ORDERED.

---

6. The fact that the "contractor" language creates an exception to only the definition of federal agency, and not to the definition of "employee of the government," of course invites the circumvention argument—namely, that because the strict control test was occasioned by the Supreme Court's interpretation of the contractor exception, reliance on the "acting on behalf of" clause should not even implicate *Logue* and *Orleans.* This Court rejects such a formalistic interpretation of the statute, however, and for essentially the same reasons it rejects a formalistic reading of the language in *Logue* and *Or-*

*leans.* Those cases clearly state a rationale for vicarious federal liability which was meant to be applied to a wide range of factual situations, and which was clearly not meant to be inapplicable merely because a particular set of facts may also happen to come within the "acting on behalf of" clause. In sum, whether construing the term "employee of the government" by way of the "contractor" exception or the "acting on behalf of" clause, the determinative issue is control by the sovereign, and the theology of *Logue* and *Orleans,* accordingly, must obtain.